[Cite as *In re C.C.*, 2013-Ohio-3195.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### DEFIANCE COUNTY

IN THE MATTER OF:

    C.C.,                                        CASE NO. 4-13-02

ABUSED CHILD.

[CASEY COLEMAN, SR.,
      APPELLANT].                      O P I N I O N
[NATASHA JEWELL nka NATASHA
COLEMAN,
      APPELLANT].

Appeal from Defiance County Common Pleas Court
Juvenile Division
Trial Court No. 30746

**Judgment Affirmed**

Date of Decision: July 22, 2013

APPEARANCES:

    *Timothy C. Holtsberry* **for Appellant-Father**

    *Peter R. Seibel* **for Appellant-Mother**

    *Morris J. Murray and Russell R. Herman* **for Appellee**

**SHAW J.**

{¶1} Father-appellant Casey Coleman ("Casey") and mother-appellant Natasha Coleman ("Natasha") appeal the February 28, 2013, judgment of the Defiance County Common Pleas Court, Juvenile Division, granting permanent custody of their minor child "C.C." to the Defiance County Department of Job and Family Services ("DCDJFS" or "the agency").

{¶2} On November 3, 2011, a complaint was filed alleging that C.C. was an abused child and a dependent child. (Doc. 3). The complaint alleged specifically that C.C., not yet three months old at the time, "suffered a fractured scapula and his parents could not provide a plausible explanation as to how such injury occurred, and furthermore, [C.C.] exhibited bruising on his face, arm and leg, as such, said child appears to be an abused child as defined in [R.C.] 2151.031(C)" and a dependent child as defined in R.C. 2151.04(C). (*Id*.) The complaint requested that C.C. be placed in the temporary custody of DCDJFS or in the legal custody of an appropriate relative. (*Id*.)

{¶3} An emergency ex-parte hearing was held, wherein probable cause was found to believe that C.C. was an abused and/or dependent child. (Doc. 1). DCDJFS was granted emergency temporary custody of C.C. pending a hearing on the matter. (*Id*.)

{¶4} On November 23, 2011, Casey and Natasha entered their initial appearance on the complaint. (Doc. 12).

{¶5} On December 22, 2011, Tennille Becker Newton was appointed Guardian Ad Litem ("GAL") for C.C. (Doc. 11).

{¶6} On February 1, 2012, a Case Plan was filed with the stated goal of returning C.C. to Casey and Natasha. (Doc. 18). The Case Plan detailed that C.C.'s parents should, *inter alia*, finish high school/get their GEDs, complete parenting classes, and maintain a clean and stable home. (*Id.*)

{¶7} On February 28, 2012, a hearing was held wherein Natasha and Casey entered pleas of "Not True" to the allegations in the complaint. (Doc. 23). DCDJFS requested that C.C. remain in the agency's temporary custody pending further hearing. (*Id.*)

{¶8} On August 6, 2012, a hearing was held wherein both Casey and Natasha entered admissions to the allegation of abuse, and in exchange for their admissions, the agency dismissed the allegation of dependency. (Doc. 36). The court accepted the admissions and subsequently found that C.C. was an abused child pursuant to R.C. 2151.031(C). The parties waived their right to a second hearing and elected to proceed immediately to disposition. (*Id.*) The parties agreed that it was in C.C.'s best interests to be placed in the temporary custody of DCDJFS, and the court found that it was, in fact, in C.C.'s best interest and so

C.C. was placed in the temporary custody of DCDJFS. (*Id.*) An entry reflecting this was filed August 15, 2012. (*Id.*)

{¶9} On November 6, 2012, DCDJFS filed a motion for permanent custody of C.C. (Doc. 47).

{¶10} On November 8, 2012, a hearing was held for annual review, and for an initial appearance on DCDJFS's motion for permanent custody. At the hearing, a representative of the agency stated that C.C.'s parents were failing to follow any terms of the case plan, that they were not visiting with the child as they should and that their lives remained unstable. (Doc. 54). The matter was set for a full hearing on the motion for permanent custody. (*Id.*)

{¶11} On February 7, 2013, the agency filed an amended motion for permanent custody, adding that C.C. had been in the temporary custody of the agency for twelve or more months of a consecutive 22 month period. (Doc. 64).

{¶12} On February 19, 2013, the GAL filed her report and recommendation, ultimately concluding that it would be in C.C.'s best interest if permanent custody was awarded to DCDJFS. (Doc. 80).

{¶13} On February 26, 2013, the case came on for a full hearing on the agency's motion for permanent custody. At the hearing, Natasha and Casey each consented to the termination of parental rights, believing it to be in C.C.'s best interest. The court conducted a colloquy with each parent individually, asking

each parent if the parent understood what the parent was consenting to and if consenting to permanent custody was the parent's decision. In addition, the court repeatedly made clear that the court was not in a hurry, and that the parents could take as much time as they wanted to be sure of their decision. In the end, Casey and Natasha consented to the termination of their parental rights, and their parental rights were terminated. Permanent custody of C.C. was awarded to the agency. An entry reflecting this was filed on February 28, 2013. (Doc. 92).

{¶14} It is from this judgment that Casey and Natasha appeal, asserting the following assignments of error for our review.[1]

{¶15} Casey asserts the following assignments of error for our review.

**ASSIGNMENT OF ERROR 1**
**THE TRIAL COURT ERRED IN FINDING THAT THE APPELLANT'S CONSENT TO THE PERMANENT CUSTODY MOTION WAS MADE VOLUNTARILY OR KNOWINGLY.**

**ASSIGNMENT OF ERROR 2**
**THE TRIAL COURT ERRED IN FINDING BY CLEAR AND CONVINCING EVIDENCE THAT THE GRANT OF PERMANENT CUSTODY TO THE AGENCY WAS IN THE CHILD'S BEST INTEREST.**

---

[1] Casey and Natasha each filed briefs in this case asserting the same assignments of error and the same arguments. Natasha's attorney's brief contained a "Supplemental Certificate of Service" stating that his brief was a duplicate brief to that filed by Casey's attorney, and was copied with the consent and permission of Casey's attorney. Natasha's attorney further stated, "[t]his counsel has done so because he agrees with the Statement of Facts, Statement of the Case, and the legal arguments. Counsel believes and [sic] second brief or double oral argument is a waste of legal resources and revenue. Counsel is appointed. Counsel has never been contacted by his Appellant [Natasha]. Counsel believes the legal arguments apply to both parents—thus, if one prevails, both must prevail. For the foregoing reasons, counsel submits the foregoing briefs on its merits and concurs with the arguments of [Casey's attorney]."

**ASSIGNMENT OF ERROR 3**
**APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.**

{¶16} Natasha asserts the following assignments of error for our review.

**ASSIGNMENT OF ERROR 1**
**THE TRIAL COURT ERRED IN FINDING THAT THE APPELLANT'S CONSENT TO THE PERMANENT CUSTODY MOTION WAS MADE VOLUNTARILY OR KNOWINGLY.**

**ASSIGNMENT OF ERROR 2**
**THE TRIAL COURT ERRED IN FINDING BY CLEAR AND CONVINCING EVIDENCE THAT THE GRANT OF PERMANENT CUSTODY TO THE AGENCY WAS IN THE CHILD'S BEST INTEREST.**

**ASSIGNMENT OF ERROR 3**
**APPELLANT WAS DENIED HER CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.**

{¶17} As the arguments in Casey and Natasha's assignments of error are identical, we will address them together.

*Casey and Natasha's First Assignments of Error*

{¶18} In Casey and Natasha's first assignments of error, they argue that the trial court erred in finding that they had knowingly and voluntarily consented to the termination of their parental rights.

{¶19} "The standard for appellate review in a permanent-custody case is whether the trial court had clear and convincing evidence to make an award of permanent custody." *In re Terrence*, 6th Dist. No. L-05-1018, 2005-Ohio-3600, ¶

86, citing *In re Hiatt*, 86 Ohio App.3d 716, 725 (4th Dist.1993). The "clear and convincing evidence" standard is a higher degree of proof than the "preponderance of the evidence" standard generally used in civil cases, but is less stringent than the "beyond a reasonable doubt" standard used in criminal cases. *State v. Schiebel*, 55 Ohio St.3d 71, 74, (1990). On appeal from an order terminating parental rights, an appellate court will not reverse the trial court's judgment if, upon a review of the record, it determines that the trial court had sufficient evidence to satisfy the clear-and-convincing-evidence standard. *In re Wise*, 96 Ohio App.3d 619, 626, (9th Dist.1994).

{¶20} In reaching its determinations regarding permanent custody, the trial court must safeguard certain fundamental rights of parents. *Terrence*, *supra*, at ¶ 87. "It is well recognized that the right to raise a child is an 'essential' and 'basic' civil right." *In re Franklin*, 3d Dist. Nos. 9-06-12, 9-06-13, 2006-Ohio-4841, ¶ 9, quoting *In re Hayes*, 79 Ohio St.3d 46, 48 (1997) (citation omitted). The Supreme Court of Ohio has held that a parent "must be afforded every procedural and substantive protection the law allows." *In re Hayes, supra*, quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist.1991). Where parental rights are permanently terminated, "it is of utmost importance that the parties fully understand their rights and that any waiver is made with full knowledge of those rights and the

consequences which will follow." *Elmer v. Lucas Cty. Children Serv. Bd.*, 36 Ohio App.3d 241, 245, (6th Dist.1987), *Terrence*, *supra*.

{¶21} "[Juvenile Rule] 34 and R.C. 2151.35 do not specifically require a full colloquy for admissions on disposition." *In re Terrence*, 6th Dist. No. L-05-1018, 2005-Ohio-3600, ¶ 89 citing *In re Erich L.,* 6th Dist. No. L–04–1340, 2005-Ohio-2945; *In re Lakes,* 2nd Dist. No. 19028, 2002-Ohio-3917. "Nevertheless, fundamental due process requires that when a parent is waiving the fundamental right to care for and have custody of a child, the trial court must have a meaningful dialogue with that parent to be certain that the consent is truly voluntary." *Terrence*, *supra*, at ¶ 89, citing *Elmer v. Lucas Cty. Children Serv. Bd., supra*. If a parent expresses uncertainty or misunderstandings about his or her decision to waive parental rights, the trial court's acceptance of the waiver is improper. *Id.*

{¶22} In the case *sub judice* the final hearing was scheduled to be heard on February 26, 2013. On that date, the parties convened, and the trial court stated on the record that three days were reserved for the hearing. (Tr. at 3). The trial court then asked all of the parties and their attorneys to introduce themselves. (*Id.*) Following this, the agency's attorney informed the court that an agreement had been reached whereby the parents wished to consent to the agency's motion for permanent custody. (*Id.* at 5).

{¶23} Natasha's attorney said that it was his understanding that Natasha wanted to consent to the agency's motion, and that he felt Natasha understood what she was doing. (Tr. at 6). The court then proceeded to address each parent individually, beginning with Natasha. The court addressed Natasha directly, who stated that she was eighteen and turning nineteen in May.[2] (Tr. at 7). Natasha stated that since the proceedings began, she had gotten married to C.C.'s father. (Tr. at 8). She also stated that C.C. was approximately eighteen months old. (*Id.*) Natasha informed the court that she had dropped out of high school and was considering getting her GED. (Tr. at 9). The following exchange then occurred between the court and Natasha.

**COURT: Do you know your lawyer's name?**

**NATASHA: Jeffrey Horvath**

**COURT: Have you had enough time to talk to him about this case?**

**NATASHA: Correct.**

**COURT: Do you feel like you understand what's going on here?**

**NATASHA: Yes.**

**COURT: Can you explain to me in your words what you think is going to happen?**

**NATASHA: That it's best for [C.C.] to be put up for adoption.**

---

[2] Natasha had been 17 at the inception of this case, and thus at an earlier hearing, the court ordered that Natasha's mother be present for the proceedings.

* * *

**COURT: * * * Was that a hard thing to tell me?**

**NATASHA: Yes.**

**COURT: Okay. Do you want to tell me that, Natasha?**

**NATASHA: That it's best for him to be put up for adoption.**

**COURT: Is that what you wanted to tell me?**

**NATASHA: Yes.**

**COURT: Do you know that you don't have to tell me that?**

**NATASHA: No.**

**COURT: Do you know that you don't have to?**

**NATASHA: Yes.**

**COURT: Has anyone made you tell me that?**

**NATASHA: No. It's just me and my husband, Casey Coleman; we took a grade [sic] on it. It's just putting us, me and him, in too much stress and it's putting him in too much stress too.**

**COURT: Okay. Tell me why you think it would be best at this time to agree to the State's motion.**

**NATASHA: So he doesn't have to see us hurting anymore [sic] than what we are.**

* * *

**COURT: Do you understand that if you agree to this motion, what you're agreeing to is you're agreeing that [C.C.] would be placed in the permanent custody of the Agency, the Defiance**

-10-

**County Department of Job and Family Services and they could then try to have Casey adopted by another family[?]**

**NATASHA: I know that.**

**COURT: You understand that?**

**NATASHA: Yes.**

**COURT: Do you know what I mean when I say permanent custody?**

**NATASHA: Yes.**

**COURT: What does that mean to you?**

**NATASHA: For adoption.**

**COURT: Yes, but permanent – the word permanent means forever.**

**NATASHA: Yes I know.**

**COURT: And you would become just legally by the law, you would become just like a stranger to that child even though you gave birth to that child. Do you understand that?**

**NATASHA: Yes.**

**COURT: You would be a stranger to that child just like I'm a stranger to that child. Do you understand that?**

**NATASHA: Yes.**

**COURT: Knowing that do you still want to agree to this?**

**NATASHA: Yes.**

**COURT: Are you under the influence of any drugs --**

**NATASHA:  No.**

**COURT:  -- or alcohol --**

**NATASHA:  No.**

**COURT:  -- right now – let me finish my question first – right now, today that would effect [sic] your ability to understand what we're talking about here?**

**NATASHA: No.**

**COURT:  Have you had enough time to talk to your lawyer about this situation.**

**NATASHA:  Yes, somewhat.**

**COURT:  Do you want more time?  We have time today[.]**

**NATASHA:  No.**

**COURT:  If you have any kind of unanswered questions, you know when you tell me somewhat, that kind of leads me to believe that maybe you haven't had quite enough time and we can take a break right now because we have all day today, tomorrow, and Thursday scheduled for this case and we can take a break right now and I'll give you that room in the back and you can go back there with Mr. Horvath and you can ask him any kind of questions that you want to ask him so that you can make sure you feel like you understand what's going on here.**

**NATASHA:  I understand completely.**

**COURT:  Would you like more time?**

**NATASHA:  No.**

**COURT:  I can give you more time.**

**NATASHA:  I don't want to sir.**

**COURT:  Do you feel rushed by this?**

**NATASHA:  No.**

**\* \* \***

**COURT:  \* \* \* Do you have any questions you want to ask me?**

**NATASHA:  No.**

**COURT:  If I go along with this and I feel like you know what you're doing and you become like a legal stranger to [C.C.], that means you can't have visitation with him or in the future or celebrate any events with him.  You won't have any other contact with him.  Do you understand that?**

**NATASHA:  Yes.**

**COURT:  Has anybody promised you anything if you did this?**

**NATASHA: No.**

**COURT:  Has anybody threatened you in anyway [sic] to do this?**

**NATASHA:  No.**

**COURT:  Do you really believe that this is in the best interests of your child?**

**NATASHA:  Yes.**

**\* \* \***

**COURT:  Do you have any questions you want to ask me?**

**NATASHA:  No.**

**COURT: You know that I'm not connected to anybody here?**

**NATASHA: I know.**

**COURT: I'm separate. If you want to ask me a question, I'll tell you the answer.**

**NATASHA: I have no questions.**

**COURT: Are you sure?**

**NATASHA: Yes.**

**COURT: Okay. I want to ask you one more time, do you understand you don't have to do this?**

**NATASHA: Yes I understand.**

**COURT: Is that what you want to do?**

**NATASHA: Yes.**

(Tr. 10-19).

{¶24} The court then concluded its discussion with Natasha and engaged Casey in a dialogue. Casey informed the court that he was nineteen years old, that he did not graduate high school, and that he was not currently employed. (Tr. at 21). The following dialogue then took place between the court and Casey.

**COURT: Do you know the name of your lawyer?**

**CASEY: Yes.**

**COURT: What's your lawyer's name?**

**CASEY: Michael Wahl.**

\* \* \*

**COURT:  Have you read this Motion that we're supposed to have a trial on today?**

**CASEY:  Yes.**

\* \* \*

**COURT:  In the first part of it here, the Prosecutor, on behalf of the Agency – when I say the Agency, I mean Job and Family Services.  They're asking that they be given permanent custody of [C.C.].  Do you understand that?**

**CASEY:  Yes.**

**COURT:  Do you know what it means when I say permanent?**

**CASEY:  Yes where we'll have no involvement with him.**

\* \* \*

**COURT:  You would give up all your rights --**

**CASEY:  Yes.**

**COURT:  -- as a parent and as a parent when a child is born to you as a parent, you have certain rights under the law.  Do you understand that?**

**CASEY:  Yes sir.**

**COURT:  You also have responsibilities that go with those rights, but you have rights and if you tell me today that you want to agree to give up permanent custody, you give up all of those rights.  Do you understand that?**

**CASEY:  Yes.**

**COURT: Is that what you want to do?**

**CASEY: I don't want to do it, but that'll be the best thing for him.**

**COURT: And I would understand you saying, "I don't want to do it." That's a logical answer, but do you really feel that that's best for [C.C.]?**

**CASEY: Yes.**

**COURT: When did you make that decision in your mind? Was it – was it like two minutes ago or --**

**CASEY: No, me and Natasha talked that over just over a week ago.**

**COURT: Did you agree to this together?**

**CASEY: Yes.**

**COURT: Do you feel like you've made the right decision?**

**CASEY: Yes.**

**COURT: Has your lawyer pressured you into making this decision?**

**CASEY: No.**

**\* \* \***

**COURT: Has anybody pressured you into making this decision?**

**CASEY: No sir.**

**COURT: Do you feel like you understand what it means to say, "I'm going to agree to permanent custody being granted?" In other words, I'm going to give up all of my rights to this child forever?**

**CASEY:  Yes sir.**

**COURT:  Do you understand that?**

**CASEY:  Yes sir.**

**COURT:  * * * Are you under the influence of any drugs or alcohol right now, Casey?**

**CASEY:  No sir.**

**COURT:  Is there anything that effects [sic] your ability to understand what's going on here today in a bad way?**

**CASEY:  No sir.**

**COURT:  Do you feel like you understand?**

**CASEY:  Yes sir.**

**COURT:  Have you had enough time to talk to your lawyer?**

**CASEY:  Yes.**

**COURT:  I can give you a break right now too and believe me when I say this and I want both of you to hear this.  I am in no hurry and we can take a break and you can go talk to your lawyers in private and ask them anything you want to ask them. Would you like some time to do that?**

**CASEY:  No sir.**

**COURT:  Do you feel like you've had enough time here?**

**CASEY:  Yes.**

**COURT:  Cause this is a big decision.  Do you understand that?**

**CASEY:  Yes sir.**

**COURT:  Do you want to agree to this motion?**

**CASEY:  Yes sir.**

**COURT:  Yes or no?**

**CASEY:  Yes.**

**COURT:  Okay.  Do you have any questions that you would like to ask me?**

**CASEY:  No sir.**

(Tr. 23-30).

{¶25} The court then addressed Casey and Natasha one more time asking them if they were sure it was the decision they wanted to make, and they stated that they understood, and that it would be in C.C.'s best interest for the agency's motion to be granted.  (Tr. at 31-32).

{¶26} On appeal, Casey and Natasha now argue that their consent was not knowing and voluntary.  To support their argument, Casey and Natasha first claim that they were told by the agency that if they consented to permanent custody regarding [C.C.], the agency would not come after future children of Casey and Natasha.  While this allegation would be troubling if true, there is absolutely nothing in the record to corroborate this statement.  All of the parents' statements in the above-cited dialogue indicate that Casey and Natasha were not pressured in any manner, or promised anything, despite repeated questioning from the court on

the subject. With absolutely no factual support for this proposition, we cannot sustain this argument.

{¶27} Next, Casey and Natasha argue that their limited education prevented them from understanding the true magnitude of the decision that they made. Despite Casey and Natasha's claims on appeal, the court made sure Casey and Natasha were aware that they were giving up their rights to C.C. and that they understood what was happening. Moreover, the court offered on multiple occasions throughout the dialogue for each parent to take additional time to consider the ramifications of their actions. Again, there is simply nothing in the record indicating the young parents did not understand and the court went to great lengths to ensure that they did, in fact, appreciate the gravity of the proceedings. Therefore, we cannot sustain this argument.

{¶28} Finally, Casey and Natasha argue that the trial court did not inform them of the rights they were waiving at the hearing. Essentially, Casey and Natasha argue that Juv.R. 29 should apply to this case, rather than Juv.R. 34, which would require a more specific dialogue between Casey and Natasha and the court. However, as the Eleventh District Court of appeals held in *In re B.M.* 11th Dist. No. 2008-G-2868, 2009-Ohio-1718, Juv.R. 29 does not apply in these circumstances. Juvenile Rule 29 applies to adjudicatory hearings, whereas Juv.R.

34 applies to dispositional hearings, which encompasses this case. Juv.R. 34(D); *In re B.M.* at ¶ 59. Therefore, Casey and Natasha's arguments are without merit.

{¶29} Accordingly, under these circumstances, we cannot find that Casey and Natasha's consent was not voluntary and knowing based on the record before us. Accordingly, Casey and Natasha's first assignments of error are overruled.

*Casey and Natasha's Second Assignments of Error*

{¶30} In Casey and Natasha's second assignments of error, they argue that the trial court erred in finding by clear and convincing evidence that the grant of permanent custody to the agency was in C.C.'s best interest. Specifically, Casey and Natasha argue that evidence beyond parental consent is necessary to determine the best interest of the child.

{¶31} At the outset, we would observe that it seems to us that the mere fact that both parents have appeared in open court and voluntarily agreed to relinquish permanent custody of their child would in itself constitute some indication that it might be in the best interest of the child for the court to do so. However, in this case, it is undisputed that both Casey and Natasha affirmatively stated that it was in C.C.'s best interest that the agency be granted permanent custody of C.C. Moreover, even assuming evidence beyond parental consent to permanent custody was necessary to prove that it was in C.C.'s best interest for the agency to be granted permanent custody, additional support for the trial court's decision exists

in this case. After speaking with the parents of C.C., the court inquired into the basis of the permanent custody motion. The agency's attorney provided the following factual summary to the court:

**Well, Your Honor, as the Amended Motion that was filed, I believe, February – let me see what date was that – 7th, indicates the child has been in the custody of the Agency for over twelve months of the past consecutive twenty-two month period. Furthermore, as the Motion indicates, it's the Agency's position that the child cannot or should not be placed back in the care of it's [sic] parents because they have failed to follow through with the objectives of the Case Plan. Some things of which require them to do certain things so that we were sure the child would be placed back into a safe environment. Also of course getting jobs, getting their education completed, having a safe place for the child to live. These things have not been accomplished along with the fact that we also alleged failure to visit. They have visited about less than half of the time. Some of those reasons were that they didn't have the gas or that type of thing to make the visits, but nevertheless there has been a – there have been some large chunks of time where they have not actually visited with the child which has been concerning and so we do feel the child needs a permanent safe and legally secure placement and that this is the best thing for the child at this time.**

(Tr. at 32-33). Counsel for both Casey and Natasha agreed with this statement of evidence. (Tr. at 33-34).

{¶32} In addition to the foregoing narrative, the GAL also reiterated the recommendation in her written report that the agency should be granted permanent custody. (Tr. at 36). The report itself mentioned many of the same facts that the agency's counsel stated in her narrative. (Doc. 80). Thus even if more than evidence of parental consent was required in this case, the court had more before it

-21-

than merely the consent of the parents. Accordingly, we cannot find that the court erred in determining by clear and convincing evidence that it was in C.C.'s best interests that the agency be granted permanent custody. Therefore, Casey and Natasha's second assignments of error are overruled.

*Casey and Natasha's Third Assignments of Error*

{¶33} In Casey and Natasha's third assignments of error, Casey and Natasha argue that they each individually received ineffective assistance of counsel. Specifically, they argue that their attorneys were ineffective for agreeing to the accuracy of the factual summary provided by the attorney for the agency quoted in the previous assignment of error, and that their attorneys were ineffective for not questioning anyone from the agency regarding the children's best interests.

{¶34} In order to succeed on a claim of ineffective assistance of counsel, an appellant must "show that his trial counsel was deficient and that such deficiency prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 104 S .Ct. 2052 (1984). Specifically, an appellant must establish 1) that the trial counsel's representation fell below an objective standard of reasonableness, and 2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*.; *State v. Bradley*, 42 Ohio St.3d 136, (1989). In reviewing the alleged deficiency of trial counsel, courts presume

that a properly licensed attorney executes his duties in an ethical and competent manner. *State v. Smith*, 17 Ohio St.3d 98, 100 (1985). The courts are to refrain from second-guessing the strategic decisions made by trial counsel. *State v. Sallie*, 81 Ohio St.3d 673, 674 (1998).

{¶35} As the dialogue between the trial court and Casey and Natasha cited above in the first assignment of error makes clear, both Casey and Natasha knew who their attorneys were, had spoken with them, understood the nature of the proceedings and despite repeated questioning by the trial court, had no further questions for their attorneys or the court. Casey and Natasha both stated they were not pressured by their attorneys, and there was no indication that they were anything less than satisfied with their representation. Moreover, Casey stated that he and Natasha had independently come to the decision to consent to permanent custody.

{¶36} While Casey and Natasha argue that their respective attorneys were ineffective for essentially allowing stipulations of adverse facts to be entered into the record that would prove it was in C.C.'s best interest for permanent custody to be granted to the agency, Casey and Natasha both individually stated that just such an outcome was in Casey's best interests. It is impossible to see under these circumstances how there would be any error in failing to question a member of the

agency regarding best interests when the parents themselves made the same statement.

**{¶37}** Moreover, even if either attorney's performance was somehow deficient, there is absolutely nothing in the record that would indicate any prejudice to Casey and/or Natasha as they explicitly expressed their desire to the court for permanent custody to be awarded to the agency. Any claim to the contrary is wholly speculative and has no basis in any fact in the record. Accordingly Natasha and Casey's third assignments of error are overruled.

**{¶38}** For the foregoing reasons Casey and Natasha's assignments of error are overruled and the judgment of the Defiance County Common Pleas Court, Juvenile Division, is affirmed.

*Judgment Affirmed*

**PRESTON, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**